IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| **SAMANTHA HALLMAN,**<br><br>        *Appellant,*<br><br>v.<br><br>**TRAVIS REEDS,** *et al.,*<br><br>        *Appellees.* | Case No.: 25-2166 |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
JUDGE BRANDY R. MCMILLION, DISTRICT JUDGE
NO. 2:25-CV-10939

**BRIEF OF APPELLANT SAMANTHA HALLMAN**

Brian D. Bardwell (0098423)
Speech Law, LLC
4403 Saint Clair Ave, Suite 400
Cleveland, OH 44103-1125
216-912-2195 Phone/Fax
brian.bardwell@speech.law
*Attorney for Appellant Samantha Hallman*

**CORPORATE DISCLOSURE STATEMENT**

Appellant Samantha Hallman is not a subsidiary or affiliate of a publicly owned corporation, and no corporation has a substantial financial interest in the outcome of this litigation.

### TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................................... ii

Table of Authorities ........................................................................................... v

Statement in Support of Oral Argument ............................................................. 1

Jurisdictional Statement ..................................................................................... 1

Issues Presented ................................................................................................. 1

Statement of the Case ......................................................................................... 2

Summary of Argument ....................................................................................... 7

Standard of Review ............................................................................................ 7

Law & Argument ............................................................................................... 8

I.   The district court erred by applying the Rule 56 standard at the pleading stage. ........................................................................................ 8

II.  Because public access is supported by both experience and logic, the district court erred in dismissing Claim 1 .......................................... 11

A.   Public access to sentencing proceedings is supported by experience because they have historically been open to the press and general public ................................................................................. 12

1.   The District Court erred by demanding a history of access to records created by a specific piece of modern technology, rather than to the proceedings they document. ....................... 13

2.   Access to audio recordings of courtroom proceedings is supported by a history of openness. ............................................ 17

B.   Public access to sentencing proceedings is supported by logic because it plays a significant positive role in the functioning of those proceedings. ........................................................................ 22

1.   The District Court erred by demanding proof of a significant positive role served by access to records created by a specific piece of modern technology, rather than access to the proceedings they document. .............................................. 23

2.   Access to audio recordings of criminal proceedings would play a significant positive role in the functioning of those proceedings. . 26

a.   Audio recordings serve a significant positive role beyond that provided by transcripts because they allow access to those who cannot read transcripts. ................................................... 26

iii

    b. Audio recordings serve a significant positive role beyond that provided by transcripts because they allow the public to verify the contents of transcripts. ...................................................27

    c. Audio recordings serve a significant positive role beyond that provided by transcripts because they allow the public to fill in the holes in the transcript. ...................................................28

    d. Audio recordings serve a significant positive role beyond that provided by transcripts because they allow the public to resolve the internal inconsistencies in transcripts. ..................29

    e. Audio recordings serve a significant positive role beyond that provided by transcripts because they allow disclose untranscribable nonverbal communication. ..........................30

    f. Audio recordings serve a significant positive role beyond that provided by transcripts because they more effectively induce public engagement. ................................................................31

  C. Public access to video recordings of motion-to-quash hearings is likewise supported by experience and logic. ...........................34

  D. Because Defendants never argue that their closure orders satisfy strict scrutiny, they violate the First Amendment right of access. ..................35

 III. Because Dr. Hallman adequately alleged a prior restraint, the district court erred in dismissing Claim 2. ........................................................37

Conclusion .............................................................................................39

Certificate of Compliance .....................................................................40

Certificate of Service ............................................................................40

Addendum ...............................................................................................1

TABLE OF AUTHORITIES

**Cases**

*Associated Press v. U.S. Dist. Ct. for Cent. Dist. of California*,
   705 F.2d 1143 (9th Cir. 1983)...............................................................17

*Associated Press v. United States*, 326 U.S. 1 (1945) ...............................2

*Baker v. Hayden*, 55 Kan. App. 2d 473 (2018) .......................................19

*Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430 (6th Cir. 2022) .......8

*Berk v. Choy*, 146 S. Ct. 546 (2026) ........................................................8

*Brown & Williamson Tobacco Corp. v. F.T.C.*,
   710 F.2d 1165 (6th Cir. 1983)................................................. 15, 23, 34

*CBS, Inc. v. U.S. Dist. Court for the Cent. Dist. of Cal.*,
   765 F.2d 823 (9th Cir.1985)........................................................ 14, 24

*Clark v. Sweeney*, 607 U.S. 7 (2025) ........................................................6

*Com. v. Winfield*, 464 Mass. 672 (2013) ..................................................6

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975)............................... 11, 39

*Craig v. Harney*, 331 U.S. 367 (1947).......................................................2

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002).......... 12, 36

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
   457 U.S. 596 (1982) ............................................... 23, 27, 31, 37

*Green v. Drinnon, Inc.*, 262 Ga. 264 (1992)............................................19

*Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004) ...........17

*In re Amends. to the Fla. Rules of Jud. Admin.*, 13 So. 3d 1044 (Fla. 2009) ..........19

*In re Hearst Newspapers, L.L.C.*, 641 F.3d 168 (5th Cir. 2011).............24

*In re Search of Fair Fin.*, 692 F.3d 424 (6th Cir. 2012)..........................34

*In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1986)........... 14, 17, 24

*Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690 (6th Cir. 2020) ..........38

*Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977)..............10

*Matter of New York Times Co.*, 828 F.2d 110 (2d Cir. 1987) .................16

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................11

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................7, 8

*Meyer v. Grant*, 486 U.S. 414 (1988) ......................................................11

*Nat'l Broad. Co., Inc.,* 828 F.2d 340 (6th Cir. 1987) ..............................12

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)..............................37

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).............................6

*People v. Rodgers*,
  No. 341976, 2019 WL 4282072 (Mich. Ct. App. Sept. 10, 2019)........................30

*Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016) ...................................................16

*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*,
  464 U.S. 501 (1984) ........................................................................... passim

*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*,
  478 U.S. 1 (1986) ............................................................................... passim

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)..................................2

*Savel v. MetroHealth Sys.*, 96 F.4th 932 (6th Cir. 2024).............................................8

*Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147 (1939) ...........11

*Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021) ......................................... 19, 39

*State v. Chancellor*, 32 S.C.L. 347 (S.C. App. L. 1847) ...........................................13

*State v. Frink*, 1 S.C.L. 168 (1791)...........................................................................13

*State v. Kitchens*, 20 S.C.L. 612 (S.C. App. L. & Eq. 1835)....................................13

*State v. Monasterio*, 4 La. Ann. 380 (1849) .............................................................13

*State, ex rel. Harmon v. Bender*, 25 Ohio St. 3d 15 (1986)......................................20

*Stevens v. Mich. State Ct. Admin. Off.*,
  No. 21-1727, 2022 WL 3500193 (6th Cir. Aug. 18, 2022)......................... passim

*United States v. Alcantara*, 396 F.3d 189 (2d Cir. 2005) ........................... 13, 14, 24

*United States v. Antar*, 38 F.3d 1348 (3d Cir. 1994)................................................17

*United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986) ...........................................6

*United States v. Chavez*, 976 F.3d 1178 (10th Cir. 2020) ........................................31

*United States v. DeJournett*, 817 F.3d 479 (6th Cir. 2016) ......................................36

*United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013) ..............................................24

*United States v. Nathan*, 27 F. Cas. 78 (C.C.D.D.C. 1834)......................................13

*United States v. Robinson*, 707 F.2d 872 (6th Cir. 1983).........................................28

*United States v. Santarelli*, 729 F.2d 1388 (11th Cir.1984) ............................. 14, 24

*United States v. Thompson*, 713 F.3d 388 (8th Cir. 2013) ........................................24

*United States v. Walker*, 761 F. App'x 822 (10th Cir. 2019) ...................................24

*Waggoner v. State*, 666 S.W.3d 384 (Tenn. Ct. App. 2022) ....................................20

**Statutes**
28 U.S.C. § 1291 ...........................................................................................................1
28 U.S.C. § 1331 ...........................................................................................................1
28 U.S.C. § 753...........................................................................................................22

78 Cong. Ch. 3, January 20, 1944, 58 Stat. 5 ........................................................22

PL 89-163, September 2, 1965, 79 Stat. 619 .........................................................22

PL 97–164, April 2, 1982, 96 Stat 25 ...................................................................22

S.D. Codified Laws § 15-15A-3 ...........................................................................20

## Rules

Alabama R. Court, Courtroom Media R. 7 ..............................................................18

Alaska R. Admin. 35 ..............................................................................................19

Alaska R. Admin. 37.5 ...........................................................................................19

Fed. R. App. P. 32 ..................................................................................................40

Fed. R. App. P. 4 ............................................................................................. 1, 19

Fed. R. Civ. P. 12 ..................................................................................... 1, 7, 9, 11

Fed. R. Civ. P. 8 ............................................................................................. 7, 8, 9

Fed. R. Evid. 1002 .................................................................................................31

Haw. Ct. Records Rule 10 ......................................................................................19

Haw. Ct. Records Rule 4 ........................................................................................19

Idaho R. Admin. Rule 32 .......................................................................................19

Ind. Access to Ct. Records Rule 4 .........................................................................19

Mich. R. Evid. 1002 ..............................................................................................31

N.H. Crim. Rule 53 ...............................................................................................20

N.J. Directives Dir. 12-20 .....................................................................................20

Neb. Sup. Ct. R. § 6-1405 .....................................................................................20

Utah R. Jud. Admin. Rule 4-202.02 ......................................................................20

Vt. R. Public Access to Ct. Records Rule 6............................................................21

## Other Authorities

J. Michael Greenwood, Julie Horney, M. Daniel Jacoubovitch, Frances B. Lowenstein & Russell R. *Wheeler, A Comparative Evaluation of Stenographic and Audiotape Methods for United States District Court* Reporting (Fed. Jud. Ctr. 1983 ..........................................................................................................28

Jeremy S. Rogers, *Open Courts Compendium*, Reps. Comm. for Freedom of the Press (July 30, 2021) ...........................................................................................19

*Nonverbal Communication from the Other Side: Speaking Body Language*, 27 SAN DIEGO L. REV. 101 (1990) ........................................................................30

*Policies and Perspectives on Video and Audio Coverage of Appellate Court Proceedings*, GAO-16-437 (Apr. 2016)..............................................................18

### STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Samantha Hallman requests oral argument on this issue of major constitutional significance. Given the nuanced nature of both the facts of the case and referenced case law, oral argument would assist the Court in clarifying details and answering any questions the panel may have.

### JURISDICTIONAL STATEMENT

There are no jurisdictional impediments to the Court hearing this case:

a)    The district court had subject-matter jurisdiction to hear Dr. Hallman's complaint under 28 U.S.C. § 1331 because its allegations of First Amendment violations raised a federal question.[1]

b)    This court has subject-matter jurisdiction under 28 U.S.C. § 1291 because the district court entered a final, appealable order on October 28, 2025.[2]

c)    Because she filed her notice of appeal from that order on December 22, 2025—within the 30 days permitted by the District Court's order granting her motion for an extension under Fed. R. App. P. 4(a)(5)(A)(i)—Dr. Hallman timely appealed.

d)    The order appealed from disposed of all claims against all Defendants.

### ISSUES PRESENTED

1.    When deciding a motion under Rule 12(b)(6), a court may not consider matters outside the pleadings. While the district court acknowledged that Dr. Hallman alleged analogous grounds for requiring access to recordings of courtroom proceedings, it dismissed her based on her failure to provide evidence that such access was supported by experience and logic. Did the district court err in dismissing the complaint based on the absence of evidence?

---

[1] Complaint, ECF #1, PageID # 33–36, ¶¶ 73–86.

[2] Judgment, ECF #22, PageID #338.

1

2.     The First Amendment right of access attaches when a proceeding has traditionally been open and openness plays a significant positive role in the functioning of that proceeding. Courts have been providing access to audio and video recordings of their proceedings for decades, leading to substantially increased public awareness and understanding of their work. Did the district court err in holding that the right of access does not attach to recordings of courtroom proceedings?

3.     Prior restraints are presumptively unconstitutional. Dr. Hallman's complaint alleges that Defendants have a policy that presumptively bans dissemination and publication of courtroom recordings that are available for public inspection on site, but the district court rejected that claim, based on an inference that no such recordings are ever available in the first place. Did the district court err in construing the allegations in favor of Defendants?

## STATEMENT OF THE CASE

Government transparency and the public's right to access and share information are key features separating our democracy from authoritarianism. These principles underlie Americans' First Amendment right to free speech, which "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public," *Associated Press v. United States*, 326 U.S. 1, 20 (1945), and requires that "[w]hat transpires in the court room is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

The Supreme Court articulated these truths as rules in a line of cases running from *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) to *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 478 U.S. 1 (1986) (*Press-Enterprise II*), which held that if a court proceeding has historically been open to the public and if public access plays a positive role in its functioning, the proceeding—

2

and the record of it—must be open to the public, unless closure can survive a strict-scrutiny analysis. In the four decades since, this "experience and logic" test has fostered an ever-increasing expansion of the First Amendment right of access from criminal trials to pretrial proceedings, to civil proceedings, and even to some administrative adjudicative processes—always asking whether the ancient tradition of open trials applies to analogous records and proceedings in the modern courtroom.

Defendants know all too well the power of audio and video to foster accountability. Earlier this year, they saw the resignation of one of their colleagues on the bench in Oakland County after an employee leaked recordings in which she admitted that despite her racism, she was "pretty untouchable" because the other 22 judges on the bench of the 52nd District Court "are pussies" who are "still going to back me."[3] Despite (or perhaps because of) the power of audio recordings to effect change, those judges—including Defendant Reeds and Defendant Asadoorian—have imposed a blanket policy against releasing any recordings of their proceedings.[4]

When Dr. Samantha Hallman, Ph.D., sought access to one of those forbidden recordings, she found herself stuck in a gap in the post–*Press-Enterprise*

---

[3] Heather Catallo, *Oakland County Judge Who Called Herself a 'New Racist' Vacates Position After WXYZ Investigation*, WXYZ Detroit (Jan. 8, 2026), available at https://www.wxyz.com/news/local-news/investigations/oakland-county-judge-who-called-herself-a-new-racist-vacates-position-after-wxyz-investigation.

[4] ECF #15-3, PageID #15-4.

*II* case law. Although that case applied the experience-and-logic test to a specific *proceeding* to determine whether the *record* of that proceeding was open to the public, lower courts have not always kept that connection in mind, often ignoring the proceeding in question and instead asking whether a specific record—or even a record maintained in a specific format—should be open to the public.

This problem came to Dr. Hallman's attention after Defendant Asadoorian presided over the prosecution of Dr. Hallman's brother on a minor-misdemeanor charge of marijuana possession. During a hearing to accept a plea and to sentence Mr. Hallman, Defendant Asadoorian lost her temper, refused to allow Mr. Hallman a promised opportunity to explain his conduct, and engaged in other "extremely unfair and intemperate conduct." Dr. Hallman requested a recording of the hearing so she could encourage voters to elect a better-qualified judge, but Defendant Asadoorian refused to release the tape.[5]

When that recording became relevant to a civil case related to Mr. Hallman's sentencing, Defendant Asadoorian and the rest of the court still refused to produce it in response to a subpoena, instead moving Michigan's Sixth Circuit Court to quash the subpoena, based on their policy of refusing public access to *any* recordings.[6] Dr. Hallman requested a copy of that recording, as well, hoping she

---

[5] Complaint, ECF #1, PageID #12–16, ¶¶ 26–37.

[6] Complaint, ECF #1, PageID #13–14, ¶¶ 29–30.

could use it instead to show the absurdity of a taxpayer-funded system for documenting court proceedings that taxpayers themselves were prohibited from accessing.[7] Although the court sent her a link to view the video, it has prohibited her from editing it or disseminating it to anyone else.[8]

In rejecting both requests, Defendants pushed Dr. Hallman to rely instead on written transcripts if she wanted to share any information about their conduct.[9] But Dr. Hallman knows—as does anyone who has read one—that a transcript can never capture or convey as much information about what happens in the courtroom as an audio or video recording would. Dr. Hallman also knows that criminal proceedings are meant to be open to the public, and she therefore brought this case against Defendants, arguing that their administrative orders restricting public access to their recordings violates the First Amendment.

Mindful that this Court had previously rejected essentially the same claims based on the absence of a "historical record compiled by the parties," *Stevens v. Mich. State Ct. Admin. Off.*, No. 21-1727, 2022 WL 3500193, at *6 (6th Cir. Aug. 18, 2022) , Dr. Hallman came prepared with a plan to assemble and present evidence that both experience and logic support access to the records she

---

[7] Complaint, ECF #1, PageID #17, ¶ 40.

[8] Complaint, ECF #1, PageID #17–19, ¶¶ 41–44.

[9] ECF #1-3, PageID #60; ECF #1-4, PageID #62.

requested. But before she had a chance to do so, Defendants moved to dismiss the complaint, arguing that because people could order, wait for, and pay for a transcript, there can be no First Amendment right of access to digital recordings of those hearings.[10] Relying on cases like *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978); *United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986); and *Com. v. Winfield*, 464 Mass. 672 (2013), which rejected a First Amendment right of access to recordings *submitted as evidence* in a judicial proceeding, they argued that there can be no right of access to recordings *of the proceeding itself*, even when it is created and maintained by the court, as these are.[11]

The district court went a different route, throwing out the case based on its *sua sponte* finding that she had failed to provide "a helpful historical record"—an argument Defendants never raised or argued. In dismissing the case on those grounds, the district court not only cut Dr. Hallman off from any opportunity to make the record it demanded, it "transgressed the party-presentation principle by granting relief on a claim that [Defendants] never asserted and that [Plaintiff] never had the chance to address." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025).

Dr. Hallman timely appealed.

---

[10] Mot. to Dismiss, ECF #15, PageID #151–52.

[11] ECF #15-3, PageID #191; ECF #15-4, PageID #197.

## SUMMARY OF ARGUMENT

As laid out below, Dr. Hallman is entitled to reversal because the district court rejected her complaint based on a failure to include a record of historical evidence, which Rule 8 does not require.

While the district court erred in requiring it in the first instance, the historical record now before this Court is sufficient to demonstrate that access to recordings of courtroom proceedings is supported by both experience and logic, as American courts have been making and releasing recordings of their proceedings for decades, and the benefits of that openness have consistently led more and more jurisdictions to do the same.

The Court should therefore reverse and hold that the First Amendment right of access attaches to a trial court's recordings of its proceedings.

## STANDARD OF REVIEW

This Court reviews a dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) *de novo*. When the dismissal is challenged on appeal, the Court must "construe the complaint in the light most favorable to the plaintiff," and it must "accept the complaint's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021).

7

**LAW & ARGUMENT**

I.    **The district court erred by applying the Rule 56 standard at the pleading stage.**

As long as its allegations are sufficient, the complaint need only include "a short and plain statement of the claim," Fed. R. Civ. P. 8. "[E]vidence of the claim is *not* required," *Berk v. Choy*, 146 S. Ct. 546, 553 (2026) (emphasis in original), so this Court "must reverse the district court's dismissal unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Meriwether* at 498. "Plaintiffs' lack of evidence [must not] terminate their suits at the motion-to-dismiss stage." *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 453 (6th Cir. 2022).

For instance, in *Savel v. MetroHealth Sys.*, 96 F.4th 932, 944 (6th Cir. 2024), a group of employees brought constructive-discharge claims against a hospital system for rejecting their requests for religious exemptions from its vaccine mandate. The district court dismissed the complaint for failure to state a claim, holding that it was "in no way obvious that a COVID-19 vaccination requirement creates an intolerable working condition as perceived by a reasonable person." But this Court reversed, holding that the district court cannot require plaintiffs to embed that evidence in their complaints:

> The district court expected too much … at this early stage. … The
> district court may ultimately be right that they cannot make that

showing. But at the pleading stage, it is too soon to consider that question.

The district court made the same mistake when it dismissed Dr. Hallman based on *Stevens*, faulting her for making "the same mistake the Sixth Circuit found in that case—a failure to provide a helpful historical record."[12] But that failure was only a mistake in *Stevens* because the district court had previously *denied* Rule 12 relief, allowing the parties an opportunity to compile, present, and contest a historical record, only to find the plaintiffs still empty-handed when they came back on Rule 56. Here, the district court denied Dr. Hallman that opportunity entirely, cutting her off from making a historical record by demanding she produce it at the pleading stage, when she was only required to present "a short and plain statement of the claim." Fed. R. Civ. P. 8(A)(2).

The district court then compounded its error by refusing to credit any of the complaint's allegations about experience or logic. Dr. Hallman alleged, for instance, that access to courtroom recordings was "the closest modern analog" to the historical practice of widespread in-court attendance,[13] but the district court set those allegations aside. Then it did the same on the logic prong: Dr. Hallman alleged, for instance, that public access to courtroom recordings would play a

---

[12] Opinion and Order Granting Mot. to Dismiss, ECF #21, PageID #332.

[13] Complaint, ECF #1, PageID #34, ¶ 76.

significant positive role by further facilitating third-party oversight of the courts, enabling the correction of errors in official transcripts, and encouraging public engagement with both the judicial and political branches of government.[14] But the district court refused to credit any of those allegations, concluding instead that there was no logic to allowing access to the audio recordings because Dr. Hallman had only alleged "mere inconvenience to exercise a constitutional right."[15]

Beyond failing to credit her other allegations on the logic prong, the district court's holding ignored the fact that convenience has *always* been relevant when analyzing burdens on the exercise of First Amendment rights. For instance, in *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 85 (1977), a New Jersey township enacted an ordinance prohibiting the posting of "For Sale" signs in an effort to prevent "white flight." The Third Circuit rejected a constitutional challenge to the ordinance, holding that the interest in stable communities outweighed any "inconvenience of having to utilize alternate methods for advertisement and information gathering." But the Supreme Court reversed, holding that First Amendment rights can't be ignored just because they could be exercised in less-convenient ways:

> The ordinance cannot be sustained on the ground that it restricts only one method of communication while leaving ample alternative

---

[14] Complaint, ECF #1, PageID #1–2, ¶ 1.

[15] Opinion and Order Granting Mot. to Dismiss, ECF #21, PageID #332.

communication channels open. The alternatives, primarily newspaper advertising and listing with real estate agents, which involve more cost and less autonomy than signs, are less likely to reach persons not deliberately seeking sales information, and may be less effective.[16]

Allegations that Defendants are burdening the exercise of Dr. Hallman's First Amendment rights are therefore not an improper demand that the court "take a leap," but an essential step in pleading her case. A full historical record, however, was not an essential step. Because Dr. Hallman had no obligation to embed that record in her complaint and was not permitted to rely on evidence outside the complaint to defend herself on Rule 12, the district court erred in granting the motion to dismiss.

## II. Because public access is supported by both experience and logic, the district court erred in dismissing Claim 1.

"In cases dealing with the claim of a First Amendment right of access to criminal proceedings," the Supreme Court directs lower courts to focus on "two

---

[16] *See also*, *Meyer v. Grant*, 486 U.S. 414, 424 (1988) ("That appellees remain free to employ other means to disseminate their ideas … does not relieve its burden on First Amendment expression."); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."); *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."); *McCullen v. Coakley*, 573 U.S. 464, 489 (2014) (rejecting buffer-zone for interfering with speakers' preferred approach, even though it "does not prevent petitioners from engaging in various forms of protest").

complementary considerations," most often referred to as the "experience and logic" test. *Press-Enterprise II* at 8. As laid out below, audio recordings of proceedings like sentencing hearings easily satisfy both prongs of that test.

### A. Public access to sentencing proceedings is supported by experience because they have historically been open to the press and general public.

"First, because, a tradition of accessibility implies the favorable judgment of experience, [the Court has] considered whether the place and process have historically been open to the press and general public." *Press-Enterprise II* at 8 (cleaned up).

*Press-Enterprise II* hung its analysis on a history of openness stretching back to the Norman Conquest, but this Court has long held that openness does not require nearly so ancient a pedigree. "[A]lthough historical context is important, a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 701 (6th Cir. 2002).

In that case, for instance, the Court found a sufficient tradition of openness by looking back 120 years to the nation's first general immigration act in 1882. And the Court only stretched back to 1924 in *In re Nat'l Broad. Co., Inc.*, 828 F.2d 340, 344 (6th Cir. 1987), where it held that a 60-year tradition of openness in

12

judicial-disqualification proceedings was sufficient to support a First Amendment

right of access to records of those proceedings.

### 1. The District Court erred by demanding a history of access to records created by a specific piece of modern technology, rather than to the proceedings they document.

Here, Dr. Hallman requested a recording of a criminal proceeding in which

the court sentenced her brother "to serve five … community service days" for a

charge of misdemeanor marijuana possession.[17] Sentencing proceedings such as

these have been open to the public for centuries. *See*, *e.g.*, Stat. 25 Geo. II, c. 37

("That sentence shall be pronounced in open court"); *State v. Frink*, 1 S.C.L. 168,

166 (1791) ("[H]e was brought up to receive sentence of burning in the hand,

which had been usually inflicted instanter in open Court.").[18] Because of this

history, and because sentencing is an essential component of the criminal trial

itself, courts unanimously hold that "the First Amendment right of access applies

---

[17] ECF #15-2, PageID #184.

[18] *See also*, *United States v. Nathan*, 27 F. Cas. 78, 78 (C.C.D.D.C. 1834) ("The prisoner pleaded guilty, and he was sentenced … in open court."); *State v. Kitchens*, 20 S.C.L. 612, 613 (S.C. App. L. & Eq. 1835) ("In this State, the practice has been to sentence the prisoner in open Court."); *State v. Chancellor*, 32 S.C.L. 347, 350 (S.C. App. L. 1847) ("All sentences must be passed in open Court, and in the presence of the party. Exposure to the public eye is a material part of every sentence, and leads to much judicial consideration."); *State v. Monasterio*, 4 La. Ann. 380, 380 (1849) (defendant "sentenced to pay a fine of three hundred dollars, and the costs of prosecution, which fine, together with the jail costs, was to be paid into the hands of the sheriff immediately in open court after judgment."); *United States v. Alcantara*, 396 F.3d 189, 197–98 (2d Cir. 2005) (collecting cases).

13

to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves." *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986).[19]

Despite the unbroken history of public access to sentencing proceedings, the district court found no such historical record had been established. But that finding required a bit of judicial sleight of hand; in assessing the tradition of public access, the district court vanished all the relevant history of access to criminal trials, all the relevant history of access to sentencing hearings, and all the relevant history of access to transcripts of those proceedings, requiring Dr. Hallman to instead prove—at the pleading stage—a history of access to records made using the specific technology Defendants had most recently adopted to perform the age-old task of preparing a verbatim record.

But neither *Richmond Newspapers* nor its progeny ever suggested that the experience-and-logic test should be ratcheted down to such extreme granularity.

---

[19] *See also*, *United States v. Alcantara*, 396 F.3d 189, 196 (2d Cir. 2005) ("There is little doubt that the First Amendment right of access extends to sentencing proceedings."); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) ("[T]he First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves."); *CBS, Inc. v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 765 F.2d 823, 826 (9th Cir.1985) (finding a right of access to documents filed in connection with a motion to reduce a sentence); *United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir.1984) ("[T]he public has a First Amendment right to see and hear that which is admitted into evidence in a public sentencing hearing.").

14

Courts have typically held that when a proceeding is open, records of that proceeding are open as well, without inquiring into the medium. Both *Press-Enterprise I* and *Press-Enterprise II*, for instance, involved appeals of requests to unseal *transcripts*, and the Supreme Court resolved both requests by reference to the history of the *proceedings* those transcripts documented: voir dire was historically open, so the public was entitled to transcripts of voir dire; likewise, preliminary hearings were historically open, so the public was entitled to transcripts of preliminary hearings. Neither case ever asked or cared whether the transcripts of those proceedings were also historically open to the public. The question is "whether the *place and process* have historically been open"—not whether the physical medium on which the process was documented has historically been open. *Press-Enterprise II* at 8 (emphasis added).

This Court took the same approach in *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178–79 (6th Cir. 1983) , where it vacated every sealing order on the district court's docket in an administrative appeal based solely on the far more general history of access to civil trials. There was no need to ask whether every single specific document was of a type that had its own history of openness; civil trials are traditionally open, so in the absence of extraordinary circumstances, the records of civil cases must be open, as well. Because the public has a legitimate interest "in ascertaining what evidence and records the District Court and this

15

Court have relied upon in reaching [their] decisions," both the proceedings themselves and the records of them must be open to the public. *Brown & Williamson Tobacco Corp.* at 1181.

This is the only rule that makes sense. If its proceedings have historically been available to the public, a court mustn't be permitted to hide them by simply renaming them or repackaging them. But that is essentially what the district court allowed here: although courts have been recording their proceedings for years—first stenographically, then using analog tape recording, and now using digital recording—it found that there was no tradition of openness for the digital recordings, even though both their low-tech predecessor and the underlying proceedings themselves have always been available to the public.

The Supreme Court has never endorsed or allowed gaming the analysis this way. *Press-Enterprise I* and *Press-Enterprise II* direct the courts to recognize a qualified right of access to records when the underlying proceeding has historically been open to the public. This Court has characterized the analysis the same way, acknowledging that "the First Amendment covers certain records filed in and transcripts of a qualifying government proceeding," *Phillips v. DeWine*, 841 F.3d 405, 419 (6th Cir. 2016).[20]

---

[20] *Accord*, *Matter of New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) ("Other circuits that have addressed this question have construed the constitutional right of access to apply to written documents submitted in connection with judicial

The trial court therefore erred in requiring proof of a history of openness with respect to audio recordings specifically.

### 2.    Access to audio recordings of courtroom proceedings is supported by a history of openness.

Likely guided by this Court's nonbinding decision in *Stevens*, the district court demanded proof of historical openness to audio and video recordings. While Dr. Hallman maintains that *Press-Enterprise II* imposes no such requirement—especially at the pleading stage—she notes that all the available evidence indicates that for as long as courts have been recording their proceedings, they have likewise been making those recordings available to the public.

Start at the top. The United States Supreme Court began making audio recordings of all its hearings more than 70 years ago, all of which it has committed to the National Archives, allowing the public to hear the Court doing its work—

---

proceedings that themselves implicate the right of access. … We agree."); *United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994) ("It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?"); *Associated Press v. U.S. Dist. Ct. for Cent. Dist. of California*, 705 F.2d 1143, 1145 (9th Cir. 1983) ("There is no reason to distinguish between pretrial proceedings and the documents filed in regard to them."); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) ("[T]he First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves."); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91–92 (2d Cir. 2004) (collecting cases).

17

word for word—despite the availability of written transcripts, as well.[21] Since then, lower courts around the country have been piling on: A report from the Government Accountability Office found that as of 2016, nine of 13 circuit courts were publishing audio recordings of their arguments, and that 47 of 50 state supreme courts were publishing audio or video of their oral arguments, as well.[22] Since that report, the Second, Tenth and Eleventh Circuits have caught up and now likewise make audio or video recordings of their proceedings publicly available,[23] as have all the remaining state supreme courts.[24]

The trend is evident in the states' lower courts, as well:

- In Alabama, the Supreme Court's Courtroom Media Plan allows the release, upon request, of "audio from the court's recording system." Alabama R. Court, Courtroom Media R. 7.

---

[21] Peter Irons & Stephanie Guitton eds., *May It Please the Court: The Most Significant Oral Arguments Made Before the Supreme Court Since 1955* (The New Press 1993), vii–viii.

[22] U.S. Gov't Accountability Off., *U.S. Supreme Court: Policies and Perspectives on Video and Audio Coverage of Appellate Court Proceedings*, GAO-16-437 (Apr. 2016), p. 51–52.

[23] See https://ww3.ca2.uscourts.gov/oral_arguments.html; https://www.ca10.uscourts.gov/oralargument/search; https://www.ca11.uscourts.gov/oral-argument-recordings.

[24] *See* https://judicial.alabama.gov/library/AVMaterials; https://supremecourt.nmcourts.gov/about-this-court/recordings-of-oral-arguments/; https://www.oscn.net/oral-arguments/; https://www.courts.ri.gov/Pages/public-access-supreme.aspx.

- In Alaska, "the electronic audio recording will constitute the official court record," Alaska R. Admin. 35, and the court record is "accessible to the public." Alaska R. Admin. 37.5.

- In Florida, "access to … recordings should not be denied or left to the unfettered discretion of the trial court or the chief judge." *In re Amends. to the Fla. Rules of Jud. Admin.*, 13 So. 3d 1044, 1047 (Fla. 2009).

- In Georgia, "[a]n official court reporter's tape of a judge's remarks in open court is a court record." *Green v. Drinnon, Inc.*, 262 Ga. 264, 264 (1992).

- In Hawaii, court records "shall be accessible during regular business hours," Haw. Ct. Records Rule 10, including "audio or video recordings of court proceedings," Haw. Ct. Records Rule 4.

- In Kentucky, "recordings are generally available to the public at the court clerk's office in the same manner that court records are available." Jeremy S. Rogers, *Open Courts Compendium: Kentucky*, Reps. Comm. for Freedom of the Press (July 30, 2021).

- In Idaho, "recordings of all trials and hearings open to the public" are "subject to examination, inspection and copying." Idaho R. Admin. Rule 32.

- In Indiana, "[a] Court may manage access to audio and video recordings of its proceedings to the extent appropriate to avoid substantial interference with the resources or normal operation of the court," but this authority "does not operate to deny to any person the right to access." Ind. Access to Ct. Records Rule 4.

- In Kansas, "digital audio recordings [are] open public records." *Baker v. Hayden*, 55 Kan. App. 2d 473, 474 (2018).

- In Maryland, "[t]he public generally has a right to obtain copies of official court recordings under the Maryland Rules." *Soderberg v. Carrion*, 999 F.3d 962, 964 (4th Cir. 2021).

- In Massachusetts, the Supreme Judicial Court has replaced official court reporters in criminal trials with electronic audio recordings "that can be provided promptly to parties, attorneys, the public, and assigned

19

transcribers." Carey, C.J., *Message on the Recording of Criminal Trials*, June 21, 2017. [25]

- In Nebraska, "any person may request a copy of the audio record of a court proceeding." Neb. Sup. Ct. R. § 6-1405.

- In New Hampshire, "[a]ny person may request a copy of the audio recording of a hearing except when a case or proceeding is confidential by statute." N.H. Crim. Rule 53.

- In New Jersey, courts provide "access to video recordings, audio recordings, and written transcripts upon request." N.J. Directives Dir. 12-20.

- In North Carolina, the Administrative Office of the Courts provides a standardized form to help the public request a "duplicate copy of verbatim audio court record." Form AOC-G-114.[26]

- In Ohio, "videotapes of trial proceedings fit squarely within the definition of public records." *State, ex rel. Harmon v. Bender*, 25 Ohio St. 3d 15, 17 (1986).

- In Oregon, the Judicial Department "records all hearings and trials for all case types" and provides a web form to ensure public access.[27]

- In South Dakota, "the public may inspect and obtain a copy of the information in a court record," including "a video image, of a document, exhibit or other thing." S.D. Codified Laws § 15-15A-3.

- In Tennessee, "[t]here can be no doubt … audio recordings [of criminal proceedings] are 'public records.'" *Waggoner v. State*, 666 S.W.3d 384, 397 (Tenn. Ct. App. 2022).

- In Utah, "[c]ourt records are public," including the "official audio record … of an open hearing." Utah R. Jud. Admin. Rule 4-202.02.

---

[25] Available online at https://www.mass.gov/important-changes/message-on-the-recording-of-criminal-trials.

[26] Available online at https://www.nccourts.gov/assets/documents/forms/g114.pdf.

[27] Available online at https://www.courts.oregon.gov/courts/washington/records/pages/audiocopies.aspx.

- In Vermont, "[t]he public has access to all judicial-branch case records." This includes audio and video of courtroom proceedings, other than a "a proceeding to which the public does not have access." Vt. R. Public Access to Ct. Records Rule 6.

- In Wisconsin, "if a member of the public wishes to purchase a copy of the digital audio recording in a matter that a transcript would be available to them, they may do so." Wisconsin Supreme Court, Guiding Principles on the Use of Digital Audio Recording, March 2023.[28]

Despite years of research into the question, Dr. Hallman can represent that she knows of no state that has adopted a rule like the ones Defendants have adopted here, imposing a blanket prohibition on accessing recordings created by the courts or on receiving copies of those recordings. Instead—at least among the states that have established a formal, statewide rule—there appears to be a longstanding and growing consensus that audiovisual recordings of courtroom proceedings should be, and are, open to the public.

That conclusion is only reinforced when zooming out to "consider historical analogues … to novel technologies," as this Court suggested in *Stevens*, at \*6. Because the point of an audio recording is to create a verbatim record of courtroom proceedings, other records serving the same function are the strongest analogues. From the moment court reporting became a responsibility of the courts rather than the parties, federal law has required verbatim records of proceedings to be placed

---

[28] Available online at https://www.wicourts.gov/publications/guides/docs/darguidingprinciples.pdf.

in the public record. That was true when the statute was first enacted in 1944, requiring a verbatim record to be made by "shorthand or by mechanical means" and placed "in the public records of the court." 78 Cong. Ch. 3, January 20, 1944, 58 Stat. 5. When Congress updated the statute to permit the use of an "electronic sound recording," it still required those recordings to be placed in the public record, PL 89-163, September 2, 1965, 79 Stat. 619, and the same remained true when Congress further permitted the use of "any other method" to create the record in 1982. PL 97–164, April 2, 1982, 96 Stat 25. The public-record requirement has been unchanged since the statute was first enacted 82 years ago, and it remains the law today. 28 U.S.C. § 753.

It is therefore well documented—and undisputed—that both criminal sentencings and recordings of courtroom proceedings have historically been open to the public.

### B. Public access to sentencing proceedings is supported by logic because it plays a significant positive role in the functioning of those proceedings.

The second step of the experience-and-logic test requires the Court to ask "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II* at 8.

"The first amendment right of access is, in part, founded on the societal interests in public awareness of, and its understanding and confidence in, the

22

judicial system." *In re Nat'l Broad. Co.*, at 345. Courts are therefore instructed to ask whether openness would advance any of a variety of interests, including "the proper functioning of a trial," "assurance that the proceedings were conducted fairly to all concerned," "discourag[ing] perjury, the misconduct of participants, and decisions based on secret bias or partiality," or "the therapeutic value of open justice." *Richmond Newspapers* at 569.

And because court orders "will be more readily accepted, or corrected if erroneous, if the public has an opportunity to review the facts presented to the court," courts should also consider whether opening a proceeding or record will "minimize judicial error and misconduct," *Brown & Williamson Tobacco Corp.* at 1178, or otherwise "permit[] the public to participate in and serve as a check upon the judicial process." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982).

> **1.    The District Court erred by demanding proof of a significant positive role served by access to records created by a specific piece of modern technology, rather than access to the proceedings they document.**

Defendants have never disputed that public access to sentencing proceedings serves a significant positive role in the functioning of those proceedings. It is hard to imagine how anyone could do so credibly, when all the interests served by public access to criminal trials outlined in *Press-Enterprise II* map so neatly onto the sentencing phase of the trial.

23

That case itself acknowledged that the benefits of openness are "even more significant" when the court exercises its power without a jury acting safeguarding against overreach, as it does in sentencing proceedings. *Press-Enterprise II* at 13. It is no surprise, then, that every circuit court to consider the question agrees, uniformly holding that public access improves the functioning of sentencing proceedings.[29]

---

[29] Some circuits focus on publicity's prophylactic effects against governmental misconduct, *see*, *In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986) ("[P]ublic access serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or wrongful conduct."), while others seem more concerned with "public confidence in the criminal justice system," *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 179 (5th Cir. 2011), or with the reinforcement of the defendant's Sixth Amendment rights, *see*, *United States v. Thompson*, 713 F.3d 388, 394 (8th Cir. 2013) ("[P]ublic access at a sentencing hearing plays a significant positive role in its functioning and furthers the benefits sought to be afforded the accused under the Sixth Amendment."). Whatever the priority, there appears to be a universal consensus that public access plays a "significant positive role" in the functioning of sentencing proceedings. *See also*, *United States v. Kravetz*, 706 F.3d 47, 57 (1st Cir. 2013) ("[O]versight serves several values when a court is called upon to exercise its discretion to impose a criminal sentence."); *United States v. Alcantara*, 396 F.3d 189, 199 (2d Cir. 2005) ("[C]onsiderations of experience and logic … support holding that, as with plea proceedings, a qualified First Amendment right of public access attaches to sentencing proceedings."); *United States v. Eppinger*, 49 F.3d 1244, 1253 (7th Cir. 1995) ("The public has a strong First Amendment claim to access to evidence admitted in a public sentencing hearing."); *CBS, Inc. v. U.S. Dist. Ct. for Cent. Dist. of California*, 765 F.2d 823, 825 (9th Cir. 1985) ("The primary justifications for access to criminal proceedings … apply with as much force to post-conviction proceedings as to the trial itself."); *United States v. Walker*, 761 F. App'x 822, 834 (10th Cir. 2019) ("[T]he importance of public access to the proceeding is even more significant" when considering a sentence, given the absence of a jury."); *United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir. 1984) ("[T]he public

Still, the district court ignored these obvious and well-known benefits and shifted its focus instead to the far narrower question of whether access to audio recordings would provide some different and distinct benefit, above and beyond the transcripts to which Defendants already allow access. It faulted Dr. Hallman for "conflat[ing] 'public presence at [a] trial' with access to recordings of those trials or hearings,"[30] but that is *exactly* how the experience-and-logic test works: both prongs supported public access to the judicial *proceedings* in question in *Press-Enterprise I* and *Press-Enterprise II*, and that meant the trial court should have granted public access to *recordings* of those proceedings, as well. At no point did the Court suggest that the right to the recordings hinged on the fact they were typewritten rather than electronic.

Here, there is no dispute that openness advances the functioning of sentencing proceedings, and the trial court therefore erred in requiring proof of a history of openness with respect to audio or video recordings specifically.

---

has a First Amendment right to see and hear that which is admitted in evidence in a public sentencing hearing.").

[30] Opinion and Order Granting Mot. to Dismiss, ECF #21, PageID #333.

**2.      Access to audio recordings of criminal proceedings would play a significant positive role in the functioning of those proceedings.**

Again, while Dr. Hallman maintains that *Press-Enterprise II* imposes no requirement that logic support public access to the specific medium of records she seeks, she notes that there is little question that public access to audio and video recordings plays a significant positive role in the functioning of sentencing proceedings. As alleged in Dr. Hallman's complaint and argued in her opposition to Defendants' motion to dismiss, those benefits are numerous.

**a.      Audio recordings serve a significant positive role beyond that provided by transcripts because they allow access to those who cannot read transcripts.**

Transcripts are written, but not everyone who wishes to know what happened in court can read written materials. According to the U.S. Department of Education's National Center for Education Statistics, 27 percent of adults in Oakland County, where Defendants are located, are at Level 2 literacy, meaning that despite approaching proficiency in reading tasks, they are "still struggling to perform tasks with text-based information," such that "complex inferencing and evaluation may be too difficult." Another 12 percent are at or below Level 1

literacy, meaning that they are "at risk for difficulties using or comprehending print material."[31]

The figures are even worse statewide. A full third of adults in Michigan are at Level 2, and another 18 percent are at Level 1. In other words, less than half the state is likely to be able to read and understand the contents of a courtroom transcript.[32] The problem can only deepen when factoring in those who *know* how to read but struggle to do so because of vision problems or learning disabilities.

Access to audio and video cures this problem, providing a mechanism for those who cannot read to nonetheless "effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co.* at 604.

### b.   Audio recordings serve a significant positive role beyond that provided by transcripts because they allow the public to verify the contents of transcripts.

Transcripts are human products and therefore inevitably subject to human error, but audio recordings can "reveal errors in the transcript." *Stevens* at *6. For instance, this Court reversed a RICO conviction premised on evidence presented

---

[31] Oakland County Summary Card, U.S. Department of Education, National Center for Education Statistics, *Skills Map: State and County Indicators of Adult Literacy and Numeracy*, available at https://nces.ed.gov/surveys/piaac/skillsmap/ ?view=comparison&geolevel=county&first=26125.

[32] Michigan Summary Card, U.S. Department of Education, National Center for Education Statistics, *Skills Map: State and County Indicators of Adult Literacy and Numeracy*, available at https://nces.ed.gov/surveys/piaac/skillsmap/ ?view=comparison&geolevel=state&first=39.

both in audio form and as a transcript in *United States v. Robinson*, 707 F.2d 872, 879 (6th Cir. 1983), where its review of the audio led it to conclude that the "transcripts utilized at trial bear little semblance of reliability."

The same is true in this case, where the public must wonder whether Defendant Asadoorian really asked Mr. Hallman, "Did you violation probation?" or invited him to "please guilty."[33] An audio recording would verify what is more likely true: that she asked whether he had *violated* probation and informed him of his option to *plead* guilty.

### c.    Audio recordings serve a significant positive role beyond that provided by transcripts because they allow the public to fill in the holes in the transcript.

Anyone with experience relying on transcripts has been frustrated by situations where rapid speech, cross-talk, mumbling, faulty microphones, or other problems have left nothing in the record except a note that a key fact was [unintelligible] or [inaudible]. A Federal Judicial Center study found that more than 10 percent of such holes were "likely to make a difference" in the proceedings.[34] With an accurate recording that can be digitally enhanced or

---

[33] ECF #15-2, PageID #167–68.

[34] J. Michael Greenwood, Julie Horney, M. Daniel Jacoubovitch, Frances B. Lowenstein & Russell R. Wheeler, *A Comparative Evaluation of Stenographic and Audiotape Methods for United States District Court Reporting* (Fed. Jud. Ctr. 1983).

replayed as many times as necessary, the public can reach more reliable conclusions about what happens in the courtroom.

### d. Audio recordings serve a significant positive role beyond that provided by transcripts because they allow the public to resolve the internal inconsistencies in transcripts.

Even if they capture everything, transcripts often have internal consistencies that leave open questions about what happened in the courtroom. This case provides a perfect example: Although Defendant Asadoorian sought to claim the high ground in a back-and-forth with Mr. Hallman by telling him "I didn't interrupt you at all," the court reporter indicated otherwise, showing her interrupting Mr. Hallman to tell him what he was saying was "garbage," again to probe his explanation for an invalid urine test, again to tell him his counselor wanted nothing to do with him, again to demand an explanation for contacting the counselor, again to question his assertion that he treated the counselor respectfully, again to question whether he threatened her, again to ask what issues he was having with her, again to demand an accounting of all his calls to her, again to demand the counselor's name, again to demand the counselor's employer's name, and again just to tell him not to speak.[35]

---

[35] ECF #15-23, 6:14–14:3.

29

Perhaps Mr. Hallman had already trailed off into silence before each of these interjections, or perhaps Defendant Asadoorian was not being truthful in her colloquy. Without an audio recording, the public has no way of knowing.

> **e.** **Audio recordings serve a significant positive role beyond that provided by transcripts because they allow disclose untranscribable nonverbal communication.**

Even if a transcript captures every word perfectly, the public "cannot read tone from the record." *People v. Rodgers*, No. 341976, 2019 WL 4282072, at *5 (Mich. Ct. App. Sept. 10, 2019). Transcripts inevitably omit nearly all nonverbal communication, which research consistently finds to be capable of conveying more meaning than the words actually spoken,[36] while recordings "could reveal the demeanor of a judge or party, adding valuable context to a 'sterile paper record,'" *Stevens* at *6, by allowing the public to "observe tone, voice inflections, facial expressions, gestures, and pauses of the speakers, thus possibly conveying a different meaning than would be in a written transcript," *In re Kentucky Court of Justice Records Retention Schedule*, Order 2025-40, Kentucky Supreme Court.[37]

---

[36] *See*, *e.g.*, John L. Barkai, *Nonverbal Communication from the Other Side: Speaking Body Language*, 27 SAN DIEGO L. REV. 101, 102 (1990) ("The nonverbal aspects of communication are widely recognized to be at least important as the words, if not more important").

[37] Available online at: https://www.kycourts.gov/Courts/Supreme-Court/Supreme%20Court%20Orders/202540.pdf.

A jury that only read a transcript of Willy Wonka warning Violet to "Stop, don't", for instance, might assess his negligence very differently than if it saw or heard the warning on video, or even heard an audio recording.[38] Courts have long acknowledged and sought to cure this deficiency when conducting their own factfinding. That is why both Fed. R. Evid. 1002 and Mich. R. Evid. 1002 enforce the "Best Evidence Rule," which requires parties to prove the contents of a recording by relying on the recording itself, rather than a transcript. *See*, *e.g.*, *United States v. Chavez*, 976 F.3d 1178, 1203 (10th Cir. 2020) ("The best-evidence rule's command is clear: a court may not admit a transcript of a recording to prove the contents of that recording unless the recording itself is admitted.").

> **f.** **Audio recordings serve a significant positive role beyond that provided by transcripts because they more effectively induce public engagement.**

If the First Amendment qualified right of access is meant "to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government," *Globe Newspaper Co.* at 604, that logic requires the release of information in the form that will allow the most citizens to most effectively participate and contribute.

---

[38] Available at https://www.youtube.com/watch?v=uVdDXeYM4ss.

To that end, Defendants concede that access to recordings of criminal proceedings may be supported by "some good public policy arguments.".[39] That puts them in agreement with *Richmond Newspapers* and every circuit to consider the question, all of which conclude—as this Court should—that public access to recordings of courtroom proceedings plays a significant positive role in the functioning of the criminal-justice process.

While the district court gave little weight to the suggestion that "evolving" norms surrounding public oversight of the courts should be relevant to the First Amendment question, those evolving norms were in fact central to the analysis in *Richmond Newspapers* and its progeny, which required greater accommodations for the press and public. While the public used to learn about the courts "by firsthand observation," they now learn about it "chiefly through the print and electronic media," a fact that "validates" claims that newsgatherers like Dr. Hallman operate "as surrogates for the public." *Richmond Newspapers* at 572–73—the media landscape in 1980 was not what it had been in the 1800, so *Richmond Newspapers* directed the courts to catch back up.

The changes from 1980 to 2026 are even more radical, so the need to evolve is even more obvious and even more paramount. Many of the fastest-growing

---

[39] Mot. to Dismiss, ECF #15, PageID 158.

mass-media outlets, such as YouTube and TikTok, rely almost exclusively on videos, which "tend to draw more clicks."[40] Because "visuals play a greater role today than five years ago in deciding the newsworthiness of a story," audiences who primarily draw their news from outlets like these are unlikely to see—let alone read—a transcript of courtroom proceedings.[41]

Indeed, the parties seem to agree that releasing video of Defendant Asadoorian engaging in "abusive conduct"[42] would result in greater awareness of what happened in her courtroom than a transcript would; in arguing that "[s]ound public policy reasons" support closure, she admits that video documenting abuse "is likely to garner more attention, be distributed more widely, and last longer in the public's attention than are copies of a transcript."[43] Dr. Hallman has always agreed.[44] The only question, then, is whether more public engagement would be salutary or deleterious. Dr. Hallman, whose interest is in "promoting open and

---

[40] Eun-Ju Lee, Edson C Tandoc, When News Meets the Audience: How Audience Feedback Online Affects News Production and Consumption, *Human Communication Research*, Volume 43, Issue 4, 1 October 2017, Pages 436–449, https://doi.org/10.1111/hcre.12123.

[41] Schwalbe, C. B., Silcock, B. W., & Candello, E. (2015). Gatecheckers at the Visual News Stream: A new model for classic gatekeeping theory. *Journalism Practice*, *9*(4), 465–483. https://doi.org/10.1080/17512786.2015.1030133.

[42] Complaint, ECF #1, PageID #2, ¶ 3.

[43] ECF #18, PageID #152–53.

[44] ECF # 1, ¶ 35.

transparent public access to courts in Michigan,"[45] believes more access is a good thing for the courts and for the public; Defendant Asadoorian, whose interest is in winning re-election, opposes public access, regardless of its benefits.

But the proceedings documented in those recordings have also historically been open to the press and general public, so the First Amendment's qualified right of access attaches not only to those proceedings themselves, but also to the court's records of them.

### C.    Public access to video recordings of motion-to-quash hearings is likewise supported by experience and logic.

The analysis runs largely the same when moving from Dr. Hallman's request for audio of the sentencing hearing to her request for video of the motion hearing. As laid out above, the First Amendment right of access generally applies across the length of a criminal trial—from preliminary hearing to sentencing—and this Court has already acknowledged that "[t]he historical support for access to criminal trials applies in equal measure to civil trials." *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983), including not just "hearings and meetings" but also "documents and other materials." *In re Search of Fair Fin.*, 692 F.3d 424, 430 (6th Cir. 2012). Defendants never dispute that civil motion hearings have historically been open to the public and press.

---

[45] Complaint, ECF #1, PageID #2, ¶ 3.

On the logic prong, that openness has numerous obvious benefits, whether the Court considers the proceeding itself or the specific media that Dr. Hallman has requested. No different than access to a criminal trial, access to civil motion hearings affords the press and public greater opportunities to observe the courts in action, build a greater understanding of their proper functions, and prevent judicial or prosecutorial misconduct. And, just as with access to a sentencing hearing, that oversight function is especially important because the court exercises judicial authority in motion hearings without a jury to check any impulses toward overreach.

And with respect to video recordings, the benefits of openness go even further than audio recordings, by providing even more information about the conduct, body language, and demeanor of the courtroom participants, and by providing a medium that is even more conducive to public dissemination.

Because civil motion hearings have historically been open and because that openness plays a significant positive role in the functioning of those proceedings, the First Amendment's qualified right of access attaches to those proceedings and the court's video records of them.

**D.** **Because Defendants never argue that their closure orders satisfy strict scrutiny, they violate the First Amendment right of access.**

Because the First Amendment right of qualified access attaches to recordings of criminal sentencings and motion-to-quash hearings, they cannot be

walled off from public review "unless specific, on the record findings are made demonstrating that 'closure is essential.'" *Press-Enterprise II* at 13–14.

As this Court has previously explained, that requires Defendants to satisfy a standard strict-scrutiny demonstration "that denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 705 (6th Cir. 2002). Both the compelling interest and the narrow tailoring must be "articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enterprise I* at 510–13.

Here, neither Defendants nor the district court have even once suggested that the closure orders can satisfy strict scrutiny. Defendants have argued that "public policy reasons exist" for closure,[46] but they never argue that any of those justifications constitute a compelling governmental interest, nor do they explain why complete or default secrecy is necessary to serve those interests, or why some less-restrictive approach would be inadequate.

Of course, no such argument would be possible, as they have adopted a default policy of secrecy: no one gets copies, no way, no how. This Court already rejected such policies in *United States v. DeJournett*, 817 F.3d 479, 485 (6th Cir.

---

[46] Mot. to Dismiss, ECF #15, PageID #152.

2016). In that case, the defendant in a money-laundering case sought to unseal his plea agreement. The district court denied his motion, pointing to a "universal policy" prohibiting public access to plea agreements and saying it "has reasons to do what it's done." This court reversed, holding that because the First Amendment right of access attached to the agreement, the trial court was required to ensure that its "reasons" were documented on the record, and that a "blanket policy" therefore "does not satisfy either the constitutional or common law standards."

The outcome should be obvious, because narrower tailoring could always be achieved through "determin[ations] on a case-by-case basis whether closure is necessary," *Globe Newspaper Co.* at 608, or redactions "limited to information that was actually sensitive," *Press-Enterprise I* at 513.

Because there have been no on-the-record findings explaining why the ban on public access is supported by a compelling governmental interest and narrowly tailored to achieve that interest, the closure orders violate the First Amendment.

### III.   Because Dr. Hallman adequately alleged a prior restraint, the district court erred in dismissing Claim 2.

"Any prior restraint on expression comes … with a 'heavy presumption' against its constitutional validity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976). "To be constitutional, a prior restraint must be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open

ample alternatives for communication." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020).

The district court rejected Dr. Hallman's prior-restraint claim by again refusing to construe the complaint's allegations in her favor or to make reasonable inferences that would support her claims. For instance, the district court distinguished the prior-restraint authorities Dr. Hallman cited from her own case by saying that they applied only to a prohibition on broadcasting "plaintiffs' copies" of courtroom proceedings, while Defendant Matis had a policy of refusing to provide copies in the first place, despite making them available for public inspection on site, leaving her with nothing to be restrained from disseminating.[47]

But that misreads the complaint's allegations and fails to draw reasonable inferences in Dr. Hallman's favor. First, the complaint does not allege a policy of pure refusal to provide copies, but rather a policy of refusing to provide copies "except in extraordinary circumstances."[48] Second, the Complaint alleges that Defendant Matis sometimes e-mails links to requesters so they can view videos of proceedings at home,[49] and that he did just this with Dr. Hallman.[50] If doing so

---

[47] Opinion and Order Granting Mot. to Dismiss, ECF #21, PageID #12–13.

[48] Complaint, ECF #1, PageID #10, ¶ 22.

[49] Complaint, ECF #1, PageID #10, fn. 3.

[50] Complaint, ECF #1, PageID #17, ¶ 40.

constitutes providing Dr. Hallman a copy of the video—and it does[51]—that would mean that Dr. Hallman was in possession of court information that the Court was prohibiting her from disseminating to anyone else, placing her squarely in line with the plaintiffs in cases like *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) ("States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."), and *Soderberg v. Carrion*, 999 F.3d 962, 969 (4th Cir. 2021) ("[T]he broadcasting of those lawfully obtained recordings cannot constitutionally be punished 'absent a need to further a state interest of the highest order.'").

Because the district court only reached a contrary conclusion by failing to either credit the complaint's allegations or draw reasonable inferences in Dr. Hallman's favor, the district court erred in dismissing Claim 2.

## CONCLUSION

Courts have been releasing recordings of their proceedings uninterrupted for decades, providing the public with greater insight into the judicial branch, instilling greater confidence in the integrity of the courts, and facilitating greater engagement with the government. Supported therefore by both experience and

---

[51] *See*, U.S. Copyright Office, DMCA Section 104 Report 78 (2001) ("[T]he transmission of a work from one person to another over the Internet results in a reproduction on the recipient's computer.") Available online at https://www.copyright.gov/docs/regstat121201.html.

logic, access to those recordings is protected by the First Amendment. Because the district court erred in concluding otherwise—and because there has been no argument that closure can satisfy strict scrutiny—the Court should reverse the district court's decision and hold that the First Amendment right of qualified access attaches to a court's recordings of its proceedings. In the alternative, it should remand with instructions to permit the parties to build and test that record.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Speech Law, LLC
4403 Saint Clair Ave, Suite 400
Cleveland, OH 44103-1125
216-912-2195 Phone/Fax
brian.bardwell@speech.law
*Attorney for Appellant Samantha Hallman*

### CERTIFICATE OF COMPLIANCE

This document contains 9,631 words and therefore complies with Fed. R. App. P. 32's type-volume limitation of no more than 13,000 words.

### CERTIFICATE OF SERVICE

I certify that on April 8, 2026, this document was served on opposing counsel as provided by Fed. R. Civ. P. 5(b)(2)(E).

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Attorney for Appellant Samantha Hallman

**ADDENDUM**

| ECF | Description | PageID |
|---|---|---|
| 1 | Complaint | 1–38 |
| 15 | Defendants' Motion to Dismiss | 127–60 |
| 17 | Hallman Response to Defendants' Motion to Dismiss | 231–63 |
| 19 | Defendants' Reply in Support of Motion to Dismiss | 303–16 |
| 21 | Opinion and Order Granting Motion to Dismiss | 324–37 |
| 22 | Judgment | 338 |
| 24 | Order Granting Hallman Motion to Extend Time to File a Notice of Appeal | 342–43 |
| 25 | Notice of Appeal | 344 |