# IN THE UNITED STATES COURT OF APPEALS

# FOR THE SIXTH CIRCUIT

---

**Samantha Hallman**
   Appellant,

  v.             Case No. 25-2166

**Travis Reeds, et al.,**
   Appellees

---

ON APPEAL FROM THE UNITES STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
THE HON. JUDGE BRANDY R. MCMILLION,
UNITED STATES DISTRICT COURT JUDGE

---

## BRIEF *AMICUS CURIAE* OF
## GRAND TRAVERSE-LEELANAU-ANTRIM BAR ASSOCIATION
## IN SUPPORT OF APPELANT URGING REVERSAL

---

/s/ Agnieszka Jury
AGNIESZKA JURY (MI P79779)
attorney@PillarServicesUSA.com

/s/Lawrence LaSusa
LAWRENCE LASUSA (MI P41558)
llasusa@lasusalaw.com

**Grand Traverse-Leelanau-Antrim
Bar Association**
PO Box 182
Traverse City, MI   49685-0182
Phone:231-668-7022

*Counsel for Amicus Curiae the Grand Traverse-Leelanau-Antrim Bar Association*

## STATEMENT REGARDING CONSENT (Rule 29(a)(2))

Plaintiff-Appellant has consented to the filing of this amicus brief. Defendants-Appellees have not indicated their position regarding the filing of this brief.

## CORPORATE DISCLOSURE STATEMENT

The Grand Traverse–Leelanau–Antrim Bar Association ("GTLABA") is a voluntary, Michigan nonprofit corporation formed on a non-stock membership basis and comprised of lawyers based in northwestern lower Michigan. Its mission is to maintain the highest professional standards and competence among attorneys, to promote collegiality and camaraderie among attorneys, to improve the administration of justice, and to provide law-related service and education to our members and the public. It has no parent corporation and issues no stock.

## RULE 29(a)(4)(E) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus Curiae states that:

No party's counsel authored this brief in whole or in part.

No party, party's counsel, or any other person contributed money intended to fund the preparation or submission of this brief.

## TABLE OF CONTENTS

STATEMENT REGARDING CONSENT (Rule 29(a)(2))……….…….i

CORPORATE DISCLOSURE STATEMENT……………………………ii

RULE 29(a)(4)(E) STATEMENT………………………..……iii

TABLE OF AUTHORITIES………………………………………v

STATEMENT OF INTEREST OF AMICUS CURIAE…………………..vi

I. Introduction ................................................. 1-2

II. Summary of Argument ......................................2-3

III. Argument .....................................................3-15

   A) The Logic Prong Requires a Functional Inquiry Into Whether Access to the Court's Audio Recordings Improves the Operation of the Judicial Process, Notwithstanding The Availability of Other Forms of Access.................3-7

   B) Audio Recordings Provide a Functionally Superior And Distinct Record of Proceedings..............................................................8-12

   C) The Lack of Access to Recordings Creates An Access-to-Justice Problem...................................................................12-15

IV. Conclusion ...................................................15-16

V. Certificate of compliance……………………………………….17

# TABLE OF AUTHORITIES

## Cases

Globe Newspaper Co. v. Superior Court,
457 U.S. 596 (1982) ..................................................................... 4, 11

Press-Enterprise Co. v. Superior Court,
478 U.S. 1 (1986) ....................................................2, 3, 6, 7, 15, 16

Richmond Newspapers, Inc. v. Virginia,
448 U.S. 555 (1980) .................................................................. 4, 11

Somberg v. McDonald, No. 23-1872 (6th Cir. 2024)……………………………6

Stevens v. Mich. State Court Admin. Off., No. 21-1727, 2022 WL 3500193
(6th Cir. Aug. 18, 2022)(Unpublished).................................................. 6, 7, 9

United States v. DeJournett, 817 F.3d 479, 484 (6th Cir. 2016)………………4

## Other Authorities

M. Hennink et al., Quality Issues of Court Reporters and Transcriptionists
.........................................................................................................10

Michigan Court Reporting and Recording Board of Review
Meeting Minutes (Mar. 13, 2020) .................................................................11

Michigan Court Rules 8.115…………………………………………………..5

Michigan Supreme Court Administrative Order No 1989-1…………………5

Taylor Jones et al., Testifying While Black: An Experimental Study of Court
Reporter Accuracy in Transcription of African American English Language,
95 Language e216 (2019). .........................................................................10

## STATEMENT OF INTEREST OF AMICUS CURIAE

The Grand Traverse–Leelanau–Antrim Bar Association ("GTLABA") is a voluntary association of attorneys practicing in Northern Michigan. Its mission includes maintaining high professional standards, improving the administration of justice, and supporting the effective functioning of the courts. Its members regularly appear in Michigan trial courts, including circuit, probate, and family division courts, many of which do not provide access to audio recordings of proceedings.

GTLABA submits this brief to provide the Court with concrete, experience-based insight into how the absence of access to court recordings affects the actual functioning of the judicial process. The issues presented in this case arise not in abstraction, but in the daily practice of law, where attorneys must draft orders, prepare pleadings, advise clients, and respond to court rulings without access to a reliable record of what occurred.

Over the past year, the issues raised in this brief have been the subject of multiple GTLABA Board of Governors meetings, resulting in the formation of an ad hoc committee to address these concerns with the 13th Circuit judiciary and staff. The extensive resources and attention devoted to these issues demonstrate that they are not theoretical concerns, but systemic problems affecting the daily operation of the courts.

## I.    INTRODUCTION

This case presents a functional question at the core of the First Amendment right of access: whether access to audio recordings of court proceedings plays a meaningful role in the operation of the judicial process. From the perspective of practicing attorneys, the answer is not theoretical. It is observable in daily litigation.

In courts throughout Michigan, attorneys routinely leave hearings without access to any reliable record of what transpired. In many jurisdictions, including the 13th Circuit Court of Michigan, transcripts are not available for months, often exceeding six months, even for short hearings generating only a few pages of testimony. During that time, attorneys must draft orders, prepare motions, file objections, respond to referee recommendations, and advise clients based only on memory and handwritten notes.

This is not merely inconvenient. It produces systemic consequences, including inaccuracies in filings and transcripts, disputes over what occurred in court, inefficiencies requiring judicial intervention, and inequities tied directly to the cost and delay of obtaining transcripts.

The Supreme Court has made it clear that the First Amendment right of access turns on whether access plays a "significant positive role in the functioning of the

particular process in question." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986). The record before this Court demonstrates that access to audio recordings does precisely that.

## II.   SUMMARY OF ARGUMENT

The logic prong of *Press–Enterprise* requires courts to determine whether access improves the functioning of the judicial process. *Id.* In the case at bar, the district court misapplied that standard by framing the inquiry as whether access to recordings is necessary when litigants may already attend proceedings and obtain transcripts. That framing is inconsistent with governing law.

The proper inquiry is whether audio recordings, as a distinct form of access, play a significant positive role in how the judicial system operates. Access to audio recordings does so in multiple concrete and measurable ways grounded in the day-to-day realities of litigation. Recordings enable attorneys to perform core legal functions immediately following hearings without waiting months for transcripts. They reduce disputes about what occurred in court, provide a necessary safeguard against transcription errors, materially improve litigation efficiency, and eliminate structural inequities tied to cost and delay. These are not abstract benefits; they are recurring realities in every Michigan court.

Recordings are not redundant of court attendance or transcripts. Nor are they a mere "third form of access." They are the only form of access that provides an immediate, reviewable, and accurate record of proceedings.

Under the functional analysis required by *Press–Enterprise*, access to audio recordings satisfies the logic prong.

### III.   ARGUMENT

**A. THE LOGIC PRONG REQUIRES A FUNCTIONAL INQUIRY INTO WHETHER ACCESS TO THE COURT'S AUDIO RECORDINGS IMPROVES THE OPERATION OF THE JUDICIAL PROCESS, NOTWITHSTANDING THE AVAILABILITY OF OTHER FORMS OF ACCESS.**

The Supreme Court's "experience and logic" framework directs courts to determine whether access plays a "significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986). This inquiry is inherently functional. It does not ask whether some level of access exists, but whether the specific form of access at issue improves the accuracy, fairness, and efficiency of the judicial process.

In the case at bar, the district court misapplied that standard by framing the inquiry as whether "logic demonstrate[s] a First Amendment right of access to audio recordings when a party already can attend a trial and receive a transcript of

proceedings." That formulation reflects a categorical approach inconsistent with governing law. The logic prong does not ask whether existing or other forms of access are sufficient. It asks whether the form of access sought—here, audio recordings—meaningfully improves how the judicial process operates.

The Supreme Court has repeatedly emphasized that public access enhances the functioning of the judicial process by improving the quality and integrity of factfinding and fostering public confidence in judicial proceedings. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) ("Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573–75 (1980).

Building on these principles, in *United States v. DeJournett*, 817 F.3d 479, 485 (6th Cir. 2016), this Court stated that "just as the public's presence at judicial proceedings plays a significant role in ensuring fairness in our criminal trials,… its access to plea agreements negotiated by the government and an accused plays a significant role in monitoring the administration of justice by plea". Despite the fact that someone could hear the plea agreement in Court and obtain a transcript of the proceeding, this Court in *DeJournett* held that "plea agreements are the quintessential judicial record, entitled to the protection of the First Amendment right to public access of judicial records".

Accordingly, the question is not whether attendance and transcripts already provide some access to proceedings. Nor is it whether recordings can be categorized as a redundant "third form of access." The proper inquiry is whether access to audio recordings, as a distinct and complementary form of access, improves the operation of the judicial process. And the answer is: it does.

Attendance, transcripts, and recordings are not interchangeable. Attendance provides only a single, momentary observation and does not permit review or verification. Transcripts, while valuable, are delayed, costly, and subject to error. Audio recordings provide something fundamentally different: an immediate, verbatim, reviewable, and permanent account of the proceeding —and they are available, if at all, only through the court itself. Parties cannot replicate that access on their own.

Although Michigan Court Rules permit recording in limited circumstances, such recording is subject to the approval of the presiding judge. Mich. Ct. R. 8.115; Mich. Sup. Ct. Admin. Order No. 1989-1. In practice, such permission is rarely, if ever, granted. Court practice further confirms that self-recording is not a realistic alternative: proceedings conducted via Zoom and broadcast to the public routinely include explicit instructions prohibiting any recording by viewers, and physical courtrooms commonly display signage directing attendees that recording is not

permitted. These prohibitions apply equally to attorneys and members of the media, who have no right to record proceedings without prior judicial authorization. This Court has expressly held that there is no First Amendment right for an attorney—or any member of the public—to record or capture publicly livestreamed proceedings, even when those proceedings are already being broadcast. *Somberg v. McDonald*, No. 23-1872 (6th Cir. 2024). As a result, self-recording is not an available substitute for access to official court recordings.

The district court's characterization of recordings as merely an additional or redundant form of access fails to account for functional differences. A party may be unable to attend a hearing, unable to afford a transcript, or unable to obtain permission to record the proceeding. Even where attendance is possible, it provides only an ephemeral experience. Even where transcripts are available, they are delayed and may not capture all features of the proceeding. Recordings are the only form of access that allow attorneys, litigants, and reviewing courts to revisit the proceeding with precision.

This Court has already recognized the functional significance of audio recordings in this context. In *Stevens*, this Court acknowledged that an argument could be made that "furnishing audio recordings, in addition to the forms of access already made available, could play a 'significant positive role' in these types of court proceedings"

6

because the "audio recordings could reveal the demeanor of a judge or party, adding valuable context to a "sterile paper record", and reveal errors in the transcript. *Stevens v. Mich. State Court Admin. Off.*, No. 21-1727, 2022 WL 3500193, at *13 (6th Cir. Aug. 18, 2022)(unpublished). Although the Court declined to resolve the logic prong in that case due to an underdeveloped record, that recognition confirms that recordings are capable of improving the functioning of the judicial process.

Where a form of access materially improves accuracy, reduces disputes, enhances efficiency, and promotes equal access to justice, it plays a significant positive role in the functioning of the judicial process. Audio recordings meet that standard. They are not duplicative of existing forms of access, nor are they merely a "third option." They are a necessary component of a functional system of public access to judicial proceedings.

Under the functional inquiry required by *Press–Enterprise*, the district court's categorical framing cannot be sustained. The inquiry is not whether recordings are indispensable, but whether they make the judicial process more accurate, efficient, and fair. The record in this case demonstrates that they do. Once the proper functional inquiry is applied, the conclusion follows: access to audio recordings satisfies the logic prong.

## B. AUDIO RECORDINGS PROVIDE A FUNCTIONALLY SUPERIOR AND DISTINCT RECORD OF PROCEEDINGS.

Attendance, transcripts, and recordings are not interchangeable. Attendance provides only a single, solitary, real-time observation and does not permit review or verification. Transcripts, while valuable, are delayed, costly, and subject to error. Audio recordings provide an immediate, reviewable, and verbatim record. Because each form of access serves a distinct function, the existence of one does not negate the necessity of another.

In practice, attorneys must act on what occurred in court immediately following a hearing. They must draft proposed orders reflecting oral rulings, prepare post-hearing briefs, memorialize agreements placed on the record, and advise clients regarding the outcome. In many Michigan courts, transcripts are not available for months. In the 13th Circuit, delays regularly exceed six months, even for short hearings producing minimal transcript pages. During that period, attorneys must rely solely on memory and handwritten notes.

This creates a material risk that filings will inaccurately reflect what occurred in court. Even diligent attorneys cannot perfectly capture the precise language, sequencing, and nuance of live proceedings, particularly in hearings involving multiple issues, rapid exchanges, or overlapping argument. This risk is especially

8

pronounced where agreements are placed on the record and later reduced to writing, or where courts issue oral rulings that must be translated into written orders. Recordings allow attorneys to review the precise language used in court, ensuring fidelity between oral rulings and written orders and thereby improving the accuracy and reliability of judicial outcomes.

The absence of recordings also leads to frequent and avoidable disputes about what occurred during hearings. Parties regularly disagree about witness testimony, the phrasing of questions, the wording of rulings, and the terms of agreements placed on the record. Without recordings, courts must resolve these disputes based on imperfect recollections or conduct additional proceedings. Recordings provide an objective reference that resolves such disputes immediately, conserving judicial resources and improving efficiency.

The problem is compounded by the limitations of transcripts. This Court has recognized that audio recordings can reveal demeanor, provide context beyond a "sterile paper record," and expose transcript errors. *Stevens v. Mich. State Court Admin. Off.*, No. 21-1727, 2022 WL 3500193, at *13 (6th Cir. Aug. 18, 2022)(unpublished).

A transcript does not capture tone, pacing, emphasis, pauses, or the interaction among participants. Recordings preserve these elements. They allow attorneys and

courts to evaluate tone and inflection, interruptions or overlapping speech, the sequence of exchanges, and contextual cues affecting interpretation. This distinction is not theoretical; it directly affects how testimony is interpreted, how credibility is assessed, how arguments are framed, and judicial decisions are made and reviewed. Tone and inflection may distinguish between certainty and hesitation, sincerity and evasion, or clarification and contradiction. Pauses and pacing may signal confusion, deliberation, or reluctance. Interruptions and overlapping speech may reflect the dynamics of examination, the degree of control exercised by counsel, or the extent to which a witness was able to fully respond. A study found that 5.8% of the time, Court Reports made no indication of laughter, shouting, pause, etc., in the transcript. Monique Hennink & Mary Beth Weber, *Quality Issues of Court Reporters and Transcriptionists for Qualitative Research*, 23 Qual. Health Res. 700 (2013)[1]. Without access to these contextual cues, understanding of testimony may be incomplete or distorted, particularly where credibility assessments are central. Industry standards such as the National Court Reporters Association (NCRA), Certified Realtime Reporters (CRR) and many states that have licensing exams likewise recognize that even certified court reporters operate at approximately 95% to 98% accuracy, meaning that measurable error rates are expected even in qualified transcripts. Taylor Jones et al., *Testifying While Black: An Experimental Study of*

---

[1] https://pmc.ncbi.nlm.nih.gov/articles/PMC4465445/

*Court Reporter Accuracy in Transcription of African American English Language,* 95 Language e216 (2019). Because transcription errors include omissions, incorrect substitutions, misheard words, and contextual loss, even relatively small error rates—when applied across the thousands of words in a typical proceeding—can materially affect the accuracy and interpretation of testimony, and have significant consequences.

A concrete example illustrates the magnitude of this problem. In a case before the 13th Circuit Court in Michigan, a transcript prepared from stenographic notes without an accompanying recording was later compared against an independently created audio record. Following a complaint, the Court Reporting and Recording Board of Review identified more than 200 errors and omissions within the first ten pages of the court reporter's transcription. Michigan Court Reporting and Recording Board of Review Meeting Minutes from March 13, 2020, pg. 3, Sandra Davids, CSR 1033. Some of those errors and omissions altered the substance of the testimony presented and could have affected the outcome of the case.

In addition, recordings are equally critical to the evaluation of judicial conduct. The Supreme Court has long recognized that public access to judicial proceedings serves as a critical check on the conduct of judges and participants, ensuring fairness, integrity, and public confidence in the judicial process. *Richmond Newspapers, Inc.*

11

*v. Virginia*, 448 U.S. 555, 569–73 (1980); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982). The manner in which a judge interacts with counsel and witnesses—including tone, phrasing, interruptions, and responsiveness—can bear directly on issues such as neutrality, fairness, and the proper exercise of judicial authority. These qualitative aspects of judicial behavior may be essential in assessing claims of bias, procedural irregularity, or the overall fairness of the proceeding. Without access to recordings, such evaluation is necessarily incomplete and may obscure conduct that is apparent only through auditory context.

Because these contextual elements bear directly on credibility determinations, the interpretation of testimony, and the evaluation of judicial conduct, they materially influence both the accuracy of factfinding and the integrity of judicial decision-making. Access to recordings ensures that these dimensions are preserved and reviewable, thereby enhancing the reliability of the adjudicative process and reinforcing confidence in judicial outcomes.

### C. THE LACK OF ACCESS TO COURT RECORDINGS CREATES AN ACCESS-TO-JUSTICE PROBLEM.

The absence of accessible recordings does not affect all litigants equally. It disproportionately burdens those who lack the financial resources to obtain

transcripts or the ability to reconstruct proceedings from memory. As a result, it creates a practical barrier to meaningful participation in the judicial process.

In Michigan, official court reporters charge approximately $3.75 per page for transcripts. For a full-day hearing, this cost can exceed $1,000. For many litigants, particularly those in family court or other high-volume dockets, this cost is prohibitive. While fee waivers are theoretically available, they are rarely granted because the financial burden shifts to the court's funding unit. In practice, many litigants must either bear the cost or proceed without an accurate record.

This creates a system in which the ability to accurately reference what occurred in court depends on financial means. Litigants who can afford transcripts are able to cite precisely to testimony and rulings. Those who cannot are forced to rely on memory or incomplete notes and their understanding of what occurred.

The impact is particularly pronounced for pro se litigants. Unlike attorneys, unrepresented parties lack training in note-taking and legal drafting. They often depend entirely on the record of the proceeding to prepare motions, objections, or responses. Without access to recordings, these litigants are effectively deprived of the ability to accurately present what occurred in their own cases. This limitation extends beyond their own filings and materially impairs their ability to obtain legal representation. A pro se litigant who cannot accurately recount the substance,

13

sequence, and context of prior proceedings may be unable to convey the posture of the case to prospective counsel. In turn, attorneys may be reluctant to enter an appearance without access to a reliable record that allows them to assess what transpired, evaluate potential error, and determine what recourse may be available. The absence of recordings thus not only impedes self-representation, but also erects a practical barrier to securing counsel, further compounding the inequities faced by unrepresented litigants.

The problem is compounded by delay. Even when transcripts are ordered, they are often not available for months. During that time, litigants must meet filing deadlines, draft objections, and respond to court rulings without access to a reliable record. This delay can materially affect the quality of submissions and the fairness of the proceedings.

The consequences are particularly significant in proceedings where the record is central to subsequent review. For example, objections to referee recommendations require litigants to identify specific errors in the proceedings. Without access to a recording, litigants may be unable to accurately identify or articulate those errors, limiting the effectiveness of judicial review.

Access to recordings would mitigate these barriers. Recordings provide a low-cost, immediate, and accurate means of accessing the record. They allow litigants,

regardless of financial means, to review what occurred, verify testimony, and prepare filings that accurately reflect the proceeding or provide the recordings to an attorney for their assessment of what transpired, evaluate potential error, and determine what recourse may be available.

Access to audio recordings also enables the use of widely available transcription tools that can convert recordings into text at minimal cost. While such tools do not replace official transcripts, they provide a practical and immediate means for litigants and attorneys to identify relevant portions of proceedings, verify language used by the court or witnesses, and prepare filings without incurring substantial expense or delay. In this way, recordings do not merely reduce cost—they make the record functionally usable in real time, further mitigating the structural inequities inherent in a system where accurate access depends on a party's financial ability to obtain transcripts.

The logic prong of *Press–Enterprise* asks whether access improves the functioning of the judicial process. A system in which accurate access to the record depends on financial ability, delay, or professional training does not function effectively. By contrast, a system that provides accessible recordings promotes fairness, accuracy, and meaningful participation for all litigants.

### D. CONCLUSION

15

Access to recordings of court proceedings is not merely an additional convenience; it is a functional necessity for the accurate, efficient, and fair operation of the judicial system. By enabling attorneys to perform their duties accurately, reducing disputes about the record, safeguarding against transcription errors, and improving judicial efficiency, recordings play a significant positive role in the functioning of the judicial process. Because audio recordings materially improve the operation of the judicial system, the logic prong of *Press–Enterprise* is satisfied. Audio recordings are not redundant—they are functionally distinct and essential to the operation of the judicial process. The district court's contrary conclusion rests on a misapplication of that standard.

For these reasons, the Court should reverse the district court's dismissal.

Dated: April 15, 2026.

Respectfully submitted,
/s/ Agnieszka Jury
AGNIESZKA JURY (MI P79779)
attorney@PillarServicesUSA.com

/s/Lawrence LaSusa
LAWRENCE LASUSA (MI P41558)
llasusa@lasusalaw.com

**Grand Traverse-Leelanau-Antrim Bar Association**
PO Box 182
Traverse City, MI   49685-0182
Phone:231-668-7022

*Counsel for Amicus Curiae the Grand Traverse-Leelanau-Antrim Bar Association*

16

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Rule 32(a)(7) because it contains approximately 3211 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and type-style requirements of Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: April 15, 2026

/s/ Agnieszka Jury

Counsel for Amicus Curiae

17